**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

HAROLD THOMAS HAMMOND,

        Petitioner,

v.                                                    Case No. 3:23-cv-764-TJC-SJH

SECRETARY, DEPARTMENT
OF CORRECTIONS,

        Respondent.

---

## ORDER

### I.    Status

Petitioner Harold Thomas Hammond, an inmate of the Florida penal system, initiated this action by filing a pro se Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus. Doc. 1. He is proceeding on an Amended Petition. Doc. 3. In the Amended Petition, Petitioner challenges a state court (Duval County, Florida) judgment of conviction for second-degree murder, tampering with evidence, possession of a firearm by a felon, and battery. He is serving a total sentence of forty years' imprisonment. Respondent filed a Response with

exhibits. Doc. 6.[1] Petitioner filed a Reply. Doc. 10. This case is ripe for review.[2]

## II.   <u>Governing Legal Principles</u>

### A. Standard Under § 2254

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See <u>Ledford v. Warden, Ga. Diagnostic & Classification Prison</u>, 818 F.3d 600, 642 (11th Cir. 2016) (explaining AEDPA deference), <u>abrogation in part on other grounds recognized by</u> <u>Smith v. Comm'r, Ala. Dep't of Corr.</u>, 67 F.4th 1335, 1348 (11th Cir. 2023). "The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." <u>Id.</u> (quoting <u>Greene v. Fisher</u>, 565 U.S. 34, 38 (2011)).

---

[1] The Court will cite exhibits by document and page number as assigned by the Court's electronic case management system.

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." <u>Jones v. Sec'y, Fla. Dep't of Corr.</u>, 834 F.3d 1299, 1318 (11th Cir. 2016) (citing <u>Chavez v. Sec'y Fla. Dep't of Corr.</u>, 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Id.</u> The Court finds that "further factual development" is unnecessary. <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. <u>Marshall v. Sec'y Fla. Dep't of Corr.</u>, 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. <u>Harrington v. Richter</u>, 562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

<u>Wilson v. Sellers</u>, 584 U.S. 122, 125-26 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1),

3

(2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified) (emphasis in original).

## B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 action in federal court, a petitioner must exhaust all state court remedies that

4

are available for challenging his state conviction. 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that Boerckel applies to the state collateral review process as well as the direct appeal process.").

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, 513 U.S. at 365-66; O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004) (parallel citations omitted).

5

A state prisoner's failure to properly exhaust available state remedies results in a procedural default, which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. See, e.g., Coleman v. Thompson, 501 U.S. 722, 747-48 (1991); Wainwright v. Sykes, 433 U.S. 72, 84-85 (1977). A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. See, e.g., Walker v. Martin, 131 S. Ct. 1120, 1127-28 (2011); Beard v. Kindler, 130 S. Ct. 612, 617-18 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. See Coleman, 501 U.S. at 750.

Martinez v. Ryan, 566 U.S. 1, 9-10 (2012) (parallel citations omitted). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause

6

for and actual prejudice from the default or (2) a fundamental miscarriage of justice. Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010). For a petitioner to establish cause and prejudice,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from raising the claim and which cannot be fairly attributable to his own conduct." McCoy v. Newsome, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting [Murray v. Carrier, 477 U.S. 478, 488 (1986)]. Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." Id. at 1261 (quoting Carrier, 477 U.S. at 494).

Wright v. Hopper, 169 F.3d 695, 706 (11th Cir. 1999) (parallel citation omitted).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." Carrier, 477 U.S. at 496. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001).

7

Ward, 592 F.3d at 1157 (parallel citation omitted). "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

**C. Ineffective Assistance of Counsel**

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003); Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the

8

proceeding would have been different absent counsel's deficient performance. Strickland, 466 U.S. at 687.

There is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland, "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

Further, "[t]he question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable—a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (internal quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at 105. As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of

9

reasonable professional assistance.'" Daniel v. Comm'r, Ala. Dep't of Corr., 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting Strickland, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." Id. (citing Richter, 562 U.S. at 105).

### III.   Factual Background and Procedural History

In February 2009, Petitioner lived in a trailer park with his girlfriend Jane Mossman and her son Timothy Mossman. Doc. 6-2 at 212. Petitioner "frequently did drugs" with Ms. Mossman and Kenneth Solada, a neighbor who lived "a few trailers down." Id. at 212, 216-17. Petitioner sometimes became upset with Ms. Mossman if they were "out of drugs." Id. at 214. Likewise, when Petitioner and Solada were out of drugs or "running low," they sometimes got angry with each other. Id. at 217. On a few occasions, Mr. Mossman overheard Petitioner threaten to "kill" Solada if he "didn't get . . . money or drugs." Id. at 218.

On the evening of February 21, Petitioner and Ms. Mossman got into an argument over the money he was using to buy drugs. Id. at 219-20, 367. Mr. Mossman saw Petitioner and his mother "roughhousing on the bed." Id. at 220. He told Petitioner to "put his hands on me" if he "wanted to put his hands on someone." Id. Petitioner responded by hitting Mr. Mossman with a hammer "several times." Id. Mr. Mossman fled the trailer and "stayed outside" for "a

10

couple of hours" before returning home. Id. at 220, 223. Later that evening, Petitioner prepared a "large box" of food for Solada. Id. at 224. As Petitioner exited the trailer, he said he was "going to [Solada's] house" and instructed Mr. Mossman "not to follow him." Id.

Around 3:00 a.m. that morning, Mr. Mossman woke to find Petitioner "washing clothes" in the trailer. Id. at 223. A few hours later, Petitioner asked Ms. Mossman for money to buy groceries. Id. at 223-24. She gave him $20—the "last money that [they] had"—and he left the trailer. Id. That evening, a neighbor named Camille Martinez became concerned about Solada because his car was parked outside his trailer and she "hadn't seen him all day long." Id. at 256-57. Martinez knocked on the door, but nobody answered. Id. at 257. She called 911. Id. at 257-58. When officers arrived, they discovered that Solada had been shot to death in his trailer. Id. at 258, 265-67. They found the murder weapon—a .22 caliber handgun—hidden in a grill near Solada's trailer. Id. at 274-76.

Petitioner eventually admitted that he was "responsible for" Solada's death, but at first he denied any role in the incident. Id. at 561. During his initial interview with law enforcement, Petitioner expressed surprise when told of Solada's fate. Id. at 355-58. He asked, "Was it an overdose?" and speculated that "the Mexicans" might have murdered Solada because he had "killed one of their cats." Id. at 358, 379. One week later, Petitioner spoke to law enforcement

11

again. This time, he claimed that when he arrived at Solada's trailer to "go grocery shopping," Solada "answer[ed] the door with a gun." Id. at 413. Solada was "mad as hell" because Petitioner had failed to trade Solada's Xanax pills for methadone. Id. at 413, 418. Solada allegedly pointed the gun "right at" Petitioner's face. Id. at 414. As the two fought over the gun, Petitioner said, "[S]top this shit. . . . [W]e're gonna get hurt." Id. During the struggle, the gun went off. Id. at 415. Petitioner then "tried to aim [the gun] toward the window," but Solada "pulled the trigger again," and a second shot was fired. Id. Petitioner took a "whole box of" Xanax from the trailer and fled the scene. Id. at 431-32.

Solada sustained two gunshot wounds to the head—one to the forehead and the other to the temple. Id. at 476, 500. The forehead wound had "stippling," which meant that the gun was likely 18 inches or closer when fired. Id. at 478-79. The temple wound had no stippling, which meant that the gun was likely more than 18 inches away when fired. Id. According to the medical examiner, either wound would have prevented Solada from engaging in "purposeful movements." Id. at 486-90, 501. In addition, there were no signs of a struggle in Solada's trailer. Id. at 330-32.

Petitioner was arrested and charged with second-degree murder, tampering with evidence, possession of a firearm by a felon,[3] and aggravated

---

[3] Petitioner had five prior felony convictions. Doc. 6-2 at 543.

12

battery with a deadly weapon. Doc. 6-1 at 56-57. Following a jury trial, Petitioner was found guilty as charged with one exception: he was convicted of the lesser-included offense of simple battery rather than aggravated battery. Id. at 728-33. Petitioner received a total sentence of forty years' imprisonment. Doc. 6-5 at 5-19. The First District Court of Appeal (First DCA) affirmed the convictions. Doc. 6-9. Petitioner then moved for postconviction relief under Florida Rule of Criminal Procedure 3.850, arguing that trial counsel was ineffective in several respects. Doc. 6-11 at 46-79. The postconviction court denied relief, and the First DCA affirmed in an unexplained decision. Id. at 208-25; Doc. 6-16. This federal habeas action followed. Docs. 1, 3.

## IV.   Analysis

### A. Ground One—Denial of Severance Motion

Petitioner argues that the trial court violated his "due process right to a fair trial" by refusing to sever the aggravated-battery charge from the other charges. Doc. 3 at 6-7. The battery charge arose from Petitioner's beating of Timothy Mossman, his girlfriend's son. Doc. 6-1 at 57. The remaining charges— including second-degree murder—stemmed from the shooting of Kenneth Solada. Id. at 56. Before trial, Petitioner moved for severance under Florida Rule of Criminal Procedure 3.152(a), arguing that the battery charge was "separate and distinct" from the other charges. Id. at 650-51. The court denied the motion on the ground that "the charges contained in the information [were]

13

all part of the same criminal episode and severance [was] not necessary for a fair determination of . . . guilt or innocence." Doc. 6-2 at 8.

The First DCA affirmed. Doc. 6-9. It found that "the murder and battery were connected by temporal proximity, physical proximity, and a common motive ([Petitioner's] desire to obtain and use drugs), thereby constituting a single criminal episode and making their consolidation proper." Id. at 3-4. According to the First DCA, the "record included evidence that [Petitioner] beat [Timothy] Mossman because Mossman's mother refused to give [Petitioner] money for drugs, and that [Petitioner] murdered Solada because Solada refused to share a bottle of Xanax pills." Id. at 5. Petitioner "contested these claims," but the First DCA declined to "conclude that the trial court abused its discretion in denying [the] motion to sever." Id. To the contrary, "a reasonable judge could conclude that the crimes were temporally [and] geographically associated and linked in some significant way." Id. Indeed, "a reasonable judge could find that the crimes were separated by only a few hours and a few yards." Id. Additionally, "a reasonable judge could conclude that severance was not necessary to achieve a fair determination of guilt or innocence, when the evidence suggested both crimes were relevant to understanding the motive behind [Petitioner's] entire criminal episode." Id. at 5-6.

Petitioner contends that the "refusal to sever" violated his constitutional rights by "taint[ing] the integrity of the trial." Doc. 3 at 6. According to him, the

14

trial featured "two separate and unrelated criminal charges under the same proceeding." Id. Petitioner maintains that the alleged error "affect[ed] the verdict" because the testimony about the battery "tipped the scales toward a determination of guilt on the charge involving the death of . . . Solada." Id. at 7.

Petitioner is not entitled to relief because he failed to exhaust the federal nature of his claim. Proper exhaustion requires a petitioner to "make the state court aware that the claims asserted present federal constitutional issues." Jimenez v. Fla. Dep't of Corr., 481 F.3d 1337, 1342 (11th Cir. 2007). To exhaust a claim, a petitioner must "do more than scatter some makeshift needles in the haystack of the state-court record." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005). Thus, "a petitioner with a claim that could arise under either state or federal law must clearly indicate to the state courts that he intends to bring a federal claim." Preston v. Sec'y, Fla. Dep't of Corr., 785 F.3d 449, 458 (11th Cir. 2015).

On direct appeal, Petitioner argued that the trial court "erred in denying the defense's motion to sever" because the two sets of charges "arose from separate encounters and were not causally related." Doc. 6-6 at 18, 25. But Petitioner couched his argument in terms of state law. He relied on Florida Rule of Criminal Procedure 3.152(a), the statute governing severance of offenses in Florida trial courts. Id. at 19. And he cited only Florida appellate decisions interpreting Rule 3.152(a). Id. at 19-25. To be sure, Petitioner stated that the

15

severance ruling denied him a "fair trial." Id. at 18. But he never asserted a violation of his *federal* right to a fair trial or due process. As the Eleventh Circuit has explained, the bare assertion that a defendant "was denied due process and a fair trial" is "insufficient to present" a federal claim because "this language could just be asserting a fair trial claim under the Florida Constitution and Florida's Due Process Clause." Zeigler v. Crosb*y*, 345 F.3d 1300, 1308 n.5 (11th Cir. 2003); see also Williams v. Sec'y, Dep't of Corr., No. 8:12-cv-973-JDW-TGW, 2015 WL 4040521, at *7 (M.D. Fla. June 25, 2015) ("Petitioner's cursory and vague statement in his Initial Brief that 'the State clearly violated the defendant's right to a fair trial' . . . [was] insufficient to present fairly to the state appellate court a federal constitutional issue."). Indeed, nowhere in his brief did Petitioner "argue federal standards" or "include references to federal case law." Ramos v. Sec'y, Fla. Dep't of Corr., 441 F. App'x 689, 696-97 (11th Cir. 2011) (petitioner failed to exhaust due process claim by arguing only that admission of evidence "violated his Florida and federal constitutional rights to due process and a fair trial"). "Under these circumstances, [Petitioner] cannot be said to have fairly apprised the state court of his federal . . . claim." Preston, 785 F.3d at 459.

Even if the federal issue had been properly exhausted, Petitioner cannot show that the rejection of his claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by

16

the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "'[C]learly established Federal law' for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." White v. Woodall, 572 U.S. 415, 419 (2014). The Supreme Court has repeatedly cautioned lower courts against framing its decisions at "a high level of generality." Nevada v. Jackson, 569 U.S. 505, 512 (2013); see also Brown v. Davenport, 596 U.S. 118, 136 (2022) (noting that "holdings that speak only at a high level of generality" "cannot supply a ground for relief" under AEDPA). Accordingly, "it is not 'an unreasonable application of' 'clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." Knowles v. Mirzayance, 556 U.S. 111, 122 (2009); see also Reese v. Sec'y, Fla. Dep't of Corr., 675 F.3d 1277, 1288 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that unsettled issue was an unreasonable application of clearly established federal law.").

The Supreme Court has never "squarely established" a constitutional standard for the severance of offenses. Knowles, 556 U.S. at 122. As several lower courts have recognized, "[t]here is no clearly established Supreme Court precedent dictating when a trial in state court must be severed." Martinez v. Yates, 585 F. App'x 460 (9th Cir. 2014); see also Grajeda v. Scribner, 541 F.

17

App'x 776, 778 (9th Cir. 2013) ("The Supreme Court has not held that a state or federal trial court's denial of a motion to sever can, in itself, violate the Constitution."); Wheeldon v. Campbell, No. 16-2054, 2017 WL 3165083, at *3 (6th Cir. Mar. 6, 2017) (noting that "the Supreme Court has not held improper joinder to be unconstitutional"). Without Supreme Court authority on point, Petitioner cannot show that the rejection of his claim violated clearly established federal law. See Woodall, 572 U.S. at 426 ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* [Supreme Court] precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error.").

Even apart from the absence of clearly established law, Petitioner is not entitled to relief because he cannot show that the failure to sever "result[ed] in compelling prejudice against which the [trial] court could offer no protection." United States v. Walser, 3 F.3d 380, 385 (11th Cir. 1993). "Even where there may be some risk of prejudice, if the possible prejudice may be cured by a cautionary instruction severance is not required." United States v. Bowers, 811 F.3d 412, 422 (11th Cir. 2016). Here, the court instructed the jury that "[a] separate crime is charged in each count of the Information[,] and while they have been tried together each crime and the evidence applicable to it must be considered separately and a separate verdict returned as to each. A finding of guilty or not guilty as to one crime must not affect your verdict as to the other

18

crimes charged." Doc. 6-2 at 743-44. "[A]bsent evidence to the contrary," the Court "presume[s] that the jury followed" these instructions. Bowers, 811 F.3d at 422. There is "no indication that the jury was unable to follow the . . . court's charge to consider the counts separately." Id. at 423. Thus, Petitioner "has not overcome the presumption that jurors are able to follow the court's instruction to separately consider the evidence relating to each count." Id.

### B. Ground Two, Sub-Claim A—Failure to Move to Suppress First Interview

According to Petitioner, trial counsel should have moved to suppress the statements he made during his first interview with law enforcement. Doc. 3 at 8. As explained above, Petitioner denied any involvement in—or knowledge of—Solada's death during this interrogation. Doc. 6-2 at 355-58. Petitioner contends that he was "impaired" at the time "due to severe mental issues that [had] resulted in a suicide attempt." Doc. 3 at 8. In Petitioner's view, his alleged "incapacitat[ion]" rendered his statements involuntary and inadmissible. Id.

The postconviction court rejected this claim, finding that counsel had no "legal basis to contest" the voluntariness of Petitioner's statements.[4] Doc. 6-11 at 212. The court reviewed the transcript and concluded that Petitioner

---

[4] The First DCA silently affirmed the denial of Petitioner's Rule 3.850 motion. Doc. 6-16. Thus, unless otherwise noted, the Court looks through the silent affirmance to the postconviction court's decision when evaluating Petitioner's ineffective-assistance claims. See Wilson, 584 U.S. at 125.

"knowingly and voluntarily consented to the . . . interview." <u>Id.</u> As the court pointed out, the detective "inquired about [Petitioner's] mental fitness to proceed with the interview." <u>Id.</u> Specifically, the detective asked whether Petitioner suffered from any "physical" or "mental" "problems" that "could prevent you from talking to me today." Doc. 6-2 at 351. Petitioner said "no." <u>Id.</u> at 352. He explained that he had "acid reflux," "asthma," and a "stomach issue" for which he had been prescribed "Zantac." <u>Id.</u> at 351-52. The detective responded, "Okay. But you can talk to me, though; right[?]" <u>Id.</u> at 352. Petitioner said, "Yes; right." <u>Id.</u> As the postconviction court noted, the detective proceeded to "thoroughly explain[] [Petitioner's] <u>Miranda</u> rights to him," and Petitioner "signed a form indicating he understood these rights." Doc. 6-11 at 213.

Next, the court examined the substantive portion of the interview. According to the court, Petitioner "provided coherent responses to the detective's questions and demonstrated his understanding of the interview's potential legal consequences." <u>Id.</u> Moreover, Petitioner "helped create a map of the trailer park, as well as a map of the rooms in the victim's trailer," and he "questioned whether law enforcement had identified him as a suspect" when the detective "requested a cheek swab." <u>Id.</u> In the court's view, these "statements indicate[d] [that Petitioner] could knowingly and voluntarily consent to the interview." <u>Id.</u> Thus, the court held that counsel "was not

20

ineffective when she failed to pursue" Petitioner's "meritless" suppression argument. Id.

This ruling was reasonable. "The determination of whether a [statement] is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's free and rational choice." United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994). "A [statement] that was not the product of free will and rational[] intellect or that was made when the individual's will was overborne by physical, psychological, or drug-induced means, is inadmissible." Parker v. Allen, 565 F.3d 1258, 1280 (11th Cir. 2009). A suspect's mental illness does not necessarily render his statement involuntary. See Colorado v. Connelly, 479 U.S. 157, 164 (1986) (stating that "a defendant's mental condition, by itself and apart from its relation to official coercion," is insufficient to warrant suppression of a confession). Instead, the suspect's condition must "undermine[] his ability to comprehend in a general way what he is doing and to communicate with coherence and context." Arvelo v. Sec'y, Fla. Dep't of Corr., 687 F. App'x 901, 906 (11th Cir. 2017).

A reasonable jurist could conclude that counsel had no basis to file a motion to suppress because Petitioner's statements were voluntary. As the postconviction court explained, Petitioner denied suffering from any "physical" or "mental" "problems" that "could prevent you from talking [to law enforcement]." Doc. 6-2 at 351-52. During the interview, Petitioner

21

communicated clearly, answered questions coherently, and gave no indication that he did not understand what was happening. In addition to the statements mentioned above, Petitioner (1) feigned surprise when told of Solada's death, (2) claimed that Solada "had a lot of enemies" and "owed people money" for drugs, and (3) explained that his "DNA is gonna come up on everything that [Solada] touched and I touched." Id. at 358, 383, 387. On this record, a competent attorney could have concluded that Petitioner's statements were voluntary because he "comprehend[ed] in a general way what he [was] doing and [was able] to communicate with coherence and context." Arvelo, 687 F. App'x at 906. Thus, the postconviction court reasonably determined that counsel "was not ineffective when she failed to pursue" Petitioner's "meritless" suppression argument. Doc. 6-11 at 213.

### C. Ground Two, Sub-Claim B—Failure to Oppose Redaction of Interviews

Petitioner faults trial counsel for allowing the jury to hear redacted versions of his two interviews with law enforcement. Doc. 3 at 8. According to Petitioner, the redactions resulted in the removal of his statement that "when he entered Solada's trailer, he was attacked and had to stand his ground and fight for his life." Doc. 6-11 at 53. In addition, the redacted versions allegedly omitted Petitioner's statements "that Solada opened the door to his residence with a gun in his hand, raising same to [Petitioner's] head, [and that] after a

22

struggle ensued, the firearm discharged into Solada's head, resulting in his death." Id. Lastly, according to Petitioner, the redacted versions did not include his statement that he regularly prepared healthy "meals" for Solada to mitigate his "diabetes." Id. at 174-75.

The postconviction court held an evidentiary hearing on this claim. Trial counsel testified that the redactions concerned the "extensive conversations between [Petitioner] and the detectives about his prior [criminal] record and things of that nature." Doc. 6-11 at 148. Counsel "requested" the redactions because she "felt [they] were required . . . to have a fair trial for [her] client." Id. at 165. According to counsel, she discussed the redactions with Petitioner before trial, and he "agreed to [them]."[5] Id. Petitioner, by contrast, testified that counsel did not discuss the redactions with him before trial. Id. at 173. He claimed that he saw the redactions "for the first time" while the "jury [was] watching" the videos. Id.

After the hearing, the postconviction court rejected Petitioner's ineffective-assistance claim. Id. at 214-15. Citing "the witnesses' demeanors and the manners in which they testified," the court found counsel's "testimony to be more credible and more persuasive than [Petitioner's] testimony." Id. at 214. The court concluded that counsel "requested the redactions as part of a

_____

[5] The state-court record does not include unredacted versions of the interviews. Doc. 6.

23

reasonable strategy to prevent the introduction of potentially prejudicial statements from the interviews, and [Petitioner] agreed to the redactions after [counsel] explained them to him." Id. at 214-15. Thus, according to the court, counsel was not deficient in handling the redactions. Id.

Petitioner fails to overcome the "doubly deferential" standard of review required by Strickland and AEDPA. Cullen v. Pinholster, 563 U.S. 170, 190 (2011). As an initial matter, the postconviction court credited counsel's testimony about the content of the redactions and her discussions with Petitioner concerning them. Doc. 6-11 at 214-15. "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review." Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011). Petitioner has not shown by "clear and convincing evidence" that the court's credibility determination was erroneous. 28 U.S.C. § 2254(e)(1).

Indeed, the record supports the court's finding that the redactions were limited to "potentially prejudicial statements" about Petitioner's criminal record. Doc. 6-11 at 214. Petitioner contends that the redactions led to the removal of his statements that (1) he acted in self-defense when Solada pointed a gun at him, and (2) he regularly prepared healthy "meals" for Solada to mitigate his "diabetes." Id. at 53, 174-75. In fact, both statements were included in the interviews played at trial. The jury heard Petitioner tell the detective

24

that Solada "pulled a gun on me and put it in my face. He answered the door with a gun. . . . And we fought, and I struggled, and I . . . said . . . stop this shit, stop it. Kenny, we're gonna get hurt, and pop." Doc. 6-2 at 412, 414. The jury also heard Petitioner tell the detective that he "cook[ed]" Solada "straight meals . . . vegetables, potatoes, rice, meats," and that Solada's diabetes improved after Petitioner "started feeding him right." Id. at 376-77.

Based on the postconviction court's reasonable determination of the facts, counsel's performance was not deficient. As counsel explained at the evidentiary hearing, the redactions concerned only the "extensive conversations between [Petitioner] and the detectives about his prior [criminal] record." Doc. 6-11 at 148. Petitioner "agreed to the redactions after [counsel] explained them to him." Id. at 214-15. Moreover, the redactions did not eliminate Petitioner's allegedly exculpatory statements. Doc. 6-2 at 376-77, 412, 414. A "competent" attorney could conclude that the redactions were necessary to prevent the jury from hearing damaging testimony about the nature of Petitioner's prior convictions. Zakrzewski v. McDonough, 455 F.3d 1254, 1258 (11th Cir. 2006); see also Thornton v. Dixon, No. 3:22-cv-5764-MCR-MJF, 2023 WL 3466818, at *13-14 (N.D. Fla. Mar. 3, 2023) (state court reasonably concluded that counsel was not deficient for seeking to redact "prejudicial information concerning [petitioner's] probation and criminal record status"), adopted by 2023 WL 3467220 (N.D. Fla.

25

May 15, 2023). Therefore, the postconviction court reasonably concluded that counsel was not deficient in handling the redactions.

**D. Ground Three—Failure to Call "Exculpatory Witness" at Trial**

Petitioner argues that trial counsel provided ineffective assistance by failing to call Adam Cuevas to testify at trial. Doc. 3 at 10. According to Petitioner, Cuevas would have testified that he arrived at Solada's residence shortly after the shooting "and found Petitioner in an agitated state with blood on his hands." Id. Petitioner was "in an obvious state of shock because [Solada] had lost his mind and attacked Petitioner." Id. Cuevas allegedly would have testified that "Petitioner told him in disbelief that '[Solada] just tried to kill me!'" Id. Petitioner argues that this testimony would have been "consistent with a self-defense claim." Id.

The postconviction court reasonably concluded that counsel "did not perform ineffectively when she failed to call Cuevas as a witness." Doc. 6-11 at 215. During his pretrial deposition, Cuevas—a convicted drug dealer who "went to federal prison"—claimed to have "no memory" of the incident. Doc. 6-2 at 284. And while Cuevas had given a statement to the police shortly after the murder, that statement does not support a claim of self-defense. Cuevas told law enforcement that he visited Petitioner's trailer and spoke to Petitioner's girlfriend, who said Petitioner was "acting weird" and had "thrown clothes in the washing machine . . . without putting laundry detergent [in]." Id. at 87.

26

Cuevas then walked toward Solada's trailer and encountered Petitioner, who "told him that [Solada] was not at home." Id. When Cuevas pointed out that Solada's "car was parked in front of [the] trailer," Petitioner "appeared agitated and told him (Cuevas) once again that [Solada] was not there and that he needed to leave." Id. Cuevas claimed that Petitioner "was pale, acting very weird, and nervous." Id. Additionally, Petitioner "kept telling [Cuevas] that [Solada] had his money." Id.

On this record, a fairminded jurist could conclude that counsel made a sensible, strategic decision to forgo calling Cuevas at trial. "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that [courts] will seldom, if ever, second guess." Conklin v. Schofield, 366 F.3d 1191, 1204 (11th Cir. 2004). A competent attorney could have decided against calling Cuevas because he claimed during his deposition to have no memory of the incident. See Duckett v. McDonough, 701 F. Supp. 2d 1245, 1270 (M.D. Fla. 2010) ("[C]ounsel made a strategic decision not to call at least one of the witnesses now identified by [petitioner] . . . because on the day of trial the witness changed his story and claimed to have no memory of the events in question."). Even if Cuevas could remember what happened, his statement to the police suggests that his testimony would have been harmful to the defense. As noted above, Cuevas claimed that when he encountered Petitioner outside Solada's trailer, Petitioner "was pale, acting very weird, and nervous." Doc. 6-1

27

at 87. Petitioner told Cuevas that "he needed to leave." Id. And Petitioner "kept telling [Cuevas] that [Solada] had his money"—a potential motive for Solada's murder. Id. Counsel did not provide ineffective assistance by declining to call a witness whose testimony likely would have harmed the defense.[6] See Gonzalez v. Sec'y, Dep't of Corr., No. 8:12-cv-634-SDM-TBM, 2015 WL 5772283, at *7 (M.D. Fla. Sept. 30, 2015) (state court reasonably concluded that counsel "likely made a strategic decision not to call [a] witness at trial based on the fact that his testimony—as counsel understood it—would have been damaging to the defense").

### E. Ground Four—Failure to File "Stand Your Ground" Motion

According to Petitioner, trial counsel should have moved to dismiss the charges under Florida's stand-your-ground law. Doc. 3 at 12. Petitioner alleges that he "found himself facing imminent death at the hands of the victim, and in an effort to neutralize that imminent threat he tried to take the gun from his friend, and the gun went off[,] killing the victim." Id. In Petitioner's view, there "were more than sufficient grounds for counsel to have filed" a stand-your-ground motion. Id. at 13. Had counsel done so, the trial court allegedly "would

---

[6] For the same reasons, Petitioner cannot show a reasonable probability that Cuevas's testimony would have made a difference at trial. See Reed v. Sec'y, Fla. Dep't of Corr., 767 F.3d 1252, 1261 (11th Cir. 2014) ("The prejudice prong requires the petitioner to establish a reasonable probability that, but for counsel's errors, the outcome at trial would have been different.").

have held a hearing where testimony of witnesses would have supported Petitioner's claim of immunity, and there is a high likelihood the trial court would have granted immunity." Id.

This claim was addressed at the postconviction evidentiary hearing. Trial counsel testified that she had "extensive conversations" with Petitioner about the possibility of filing a stand-your-ground motion. Doc. 6-11 at 150. She told him that (1) she "did not think we could in any way, shape, or form meet our burden required in regards to immunity," and (2) a stand-your-ground motion would "necessitate [Petitioner] taking the stand in [a pretrial] hearing," which would "not only give the State an opportunity for additional cross-examination, but create additional records so that any . . . inconsistencies could then later be used in a subsequent trial." Id. The latter point was important because Petitioner was adamant about testifying at trial. Id. at 150-51. According to counsel, Petitioner "acquiesced" to counsel's decision to forgo a stand-your-ground motion. Id. at 160-61.

The postconviction court ultimately rejected Petitioner's ineffective-assistance claim, finding that counsel "did not perform deficiently when she rejected pursuing" a stand-your-ground motion. Id. at 218. As the court pointed out, the stand-your-ground statute provides immunity "from criminal prosecution" to a defendant "who uses force as permitted [under Florida law]." Id. at 216. When a "defendant claims immunity under [the stand-your-ground

29

statute], the trial court must conduct a pretrial evidentiary hearing to decide the factual question of the applicability of the statutory immunity." Id. After reviewing the hearing testimony, the court concluded that counsel "considered a stand-your-ground defense, but reasonably rejected pursuing the defense" based on the low "likelihood of success on the merits and [Petitioner's] decision to testify at a trial." Id. at 217. The court accepted counsel's explanation that Petitioner "would likely have had to testify at an immunity hearing," which "would provide an additional record for impeachment at trial." Id. Likewise, the court credited counsel's assertion that she "did not believe the defense could meet its burden of proof" at a stand-your-ground hearing. Id.

This ruling was reasonable. "There is a strong presumption that counsel's performance falls within the wide range of professional assistance[;] the [petitioner] bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." Kimmelman v. Morrison, 477 U.S. 365, 381 (1986). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690. It is "a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." Johnson v. Sec'y, DOC, 643 F.3d 907, 911 (11th Cir. 2011). "[I]t is rarer still for merit to be found in a claim that challenges a strategic

30

decision of counsel." <u>Nance v. Warden, Ga. Diagnostic Prison</u>, 922 F.3d 1298, 1303 (11th Cir. 2019).

The postconviction court reasonably concluded that counsel made a sound, strategic decision to refrain from filing a stand-your-ground motion. As noted above, counsel testified that she declined to file such a motion because (1) she did not think the court would grant it and (2) Petitioner would need to "tak[e] the stand in [a pretrial] hearing," which would "not only give the State an opportunity for additional cross-examination, but create additional records so that any . . . inconsistencies could then later be used in a subsequent trial." Doc. 6-11 at 150. Based on this testimony, a reasonable jurist could conclude that counsel was not deficient for failing to pursue a stand-your-ground motion. <u>See</u> <u>Brown v. Fla. Dep't of Corr.</u>, No. 22-cv-60645, 2023 WL 2734227, at *6 (S.D. Fla. Mar. 31, 2023) (holding that trial counsel made a "strategic decision[]" to forgo a stand-your-ground motion based on concerns about "potential prejudice [p]etitioner would face if his testimony were used at a later trial"); <u>Boyington v. Sec'y, Fla. Dep't of Corr.</u>, No. 3:18-cv-810-BJD-MCR, 2021 WL 719644, at *4-5 (M.D. Fla. Feb. 24, 2021) ("When counsel made a strategic decision not to raise the Stand Your Ground immunity issue prior to trial, he based it on the state of the law at the relevant time, and he knew and understood the Stand Your Ground law and made a strategic decision not to raise the matter pre-trial."); <u>Jackson v. Fla. Dep't of Corr., Sec'y</u>, No. 5:16-cv-301-LC-CJK, 2018 WL

31

3433300, at *9 (N.D. Fla. June 12, 2018) ("[T]he state court reasonably concluded that counsel's failure to file the motion to dismiss petitioner now proposes was a strategic decision made after thorough investigation of the facts and careful, reasonable consideration of the advantages and disadvantages of moving to dismiss the charge on Stand Your Ground immunity."), adopted by 2018 WL 3430694 (N.D. Fla. July 16, 2018). Thus, the postconviction court reasonably rejected Petitioner's ineffective-assistance claim.

Even if AEDPA deference did not apply, Petitioner's claim would fail under *de novo* review for lack of prejudice.[7] Had Petitioner filed a stand-your-ground motion, he would have had to prove "by a preponderance of the evidence" that he was immune from prosecution.[8] State v. Gallo, 76 So. 3d 407, 409 & n.2 (Fla. 2d DCA 2011). Petitioner argued self-defense at trial, "where the State had the greater burden of showing beyond a reasonable doubt that [Petitioner] did *not* act in self-defense." Briner v. Sec'y, Dep't of Corr., No. 6:15-cv-1117-PGB-TBS, 2018 WL 560609, at *4 (M.D. Fla. Jan. 25, 2018) (citing Fields v.

---

[7] The postconviction court "did not decide the prejudice issue," so this Court "decide[s] it *de novo*." Johnson v. Sec'y, DOC, 643 F.3d 907, 935 (11th Cir. 2011).

[8] After Petitioner's trial, the Florida legislature amended the stand-your-ground statute. "In light of the 2017 amendment, a defendant is no longer required to prove that he or she acted in self-defense by a preponderance of the evidence at an immunity hearing; instead, a defendant need only make a prima facie showing at that point. To defeat the claim of immunity, the State must prove by clear and convincing evidence that the defendant did not act in self-defense." Boston v. State, 326 So. 3d 673, 675 (Fla. 2021).

State, 988 So. 2d 1185, 1186 (Fla. 5th DCA 2008)). The prosecution met its burden at trial, and Petitioner was convicted of second-degree murder. "Given that the State was able to prove beyond a reasonable doubt that [Petitioner] was not legally justified in his use of force, [he] has not met his burden of showing Strickland prejudice from" trial counsel's failure to file a stand-your-ground motion. Id.; see also Roberts v. Sec'y, DOC, No. 2:18-cv-501-JES-NPM, 2021 WL 2315070, at *5 (M.D. Fla. June 7, 2021) (state court reasonably rejected Strickland claim based on failure to file stand-your-ground motion because petitioner raised self-defense at trial, and his "testimony failed to even raise a reasonable doubt of [his] guilt in the minds of the jurors").

**F. Ground Five—Failure to Object to "Prosecutorial Misconduct"**

Petitioner contends that trial counsel was deficient for failing to object to "prosecutorial misconduct" at trial. Doc. 3 at 14; Doc. 10 at 9-10. On cross-examination, Petitioner was extensively impeached with the statements he made during his first interview with law enforcement, the one in which he denied any knowledge of Solada's death. For example, the prosecutor confronted Petitioner with a statement in which he feigned ignorance of Solada's fate: "And you say, 'Oh, God, what happened, did he [Solada] OD on Xanax?'" Doc. 6-2 at 573-74. Each time Petitioner admitted to making a statement that conflicted with his trial testimony, the prosecutor had him put a "mark" on the touchscreen. E.g., id. at 570-71. During closing argument, the prosecutor said

33

he had "lost count of all the marks that [Petitioner] had a chance to actually say something about [the shooting], he lied, he tried to blame everybody else." Id. at 637. Petitioner contends that counsel should have objected to the cross-examination and the closing argument, which allegedly "compel[led] [him] to actively participate in his own prosecution." Doc. 3 at 14.

Petitioner argues that counsel should have objected to several other statements the prosecutor made during closing argument. Doc. 6-11 at 68-73. For example, the prosecutor said, "I'll posit to you what was really going on is [Petitioner was] trying to figure out exactly how he can construct this particular set of lies." Id. at 69. The prosecutor also asked, "Does [Petitioner's] testimony agree with anyone else's testimony or any evidence? No. That cheese stands alone." Id. Petitioner faults counsel for failing to object to what he describes as "a merciless battery of attacks on [his] character." Doc. 3 at 14.

At the evidentiary hearing, trial counsel explained her "general" approach to objections: "[W]hen I hear something that is objectionable, my first reaction is not to stand up and object. My first initial thing is, do I want to object? Do I want to . . . highlight . . . what I just perceived as possibly not kosher?" Doc. 6-11 at 153. Counsel testified that she "vividly remember[ed]" the cross-examination. Id. at 152. She thought the prosecutor was "extremely aggressive" with Petitioner, who "at that time was forced to use a walker." Id. Counsel believed Petitioner "held his own extremely well," concealing his "frustration"

34

and maintaining a "completely professional" "tone." Id. It "appeared" to counsel that the "jurors start[ed] feeling compassion for" Petitioner because the prosecutor was "too aggressive." Id. Counsel felt the same way about the "closing," during which the prosecutor was also "extremely aggressive." Id. In short, counsel believed the prosecutor's approach would "backfire." Id. at 152-53. Thus, instead of raising objections that could "highlight" harmful testimony and damage the defense, she chose to "respond in kind" during her closing argument. Id. at 153.

After the hearing, the postconviction court held that counsel was "not ineffective" for declining to object to the alleged prosecutorial misconduct. Id. at 222. The court credited counsel's testimony that she "did not object . . . because she thought it could be harmful to the defense," that she "believed the jurors would feel compassion for [Petitioner] based on his" physical condition and the prosecutor's "aggressive" approach, and that her "trial strategy" was to "respond to [the prosecutor's] comments during her closing argument." Id. at 221-22. In light of this testimony, the court found that counsel's "trial strategy of eliciting the jury's sympathy and not drawing attention to harmful comments was reasonable." Id. at 222. According to the court, counsel "considered [the prosecutor's] prosecutorial style, as well as the facts of the case, such as [Petitioner's] contradictory statements to detectives, in reaching her decision." Id. The court concluded that counsel did not provide ineffective assistance by

35

choosing "to elicit sympathy from the jury and proceed with a credible, transparent defense." Id.

This ruling was reasonable. A fairminded jurist could conclude that Petitioner failed to overcome the "strong presumption" that counsel employed a "sound strategy" for handling the prosecutor's remarks. Kimmelman, 477 U.S. at 381. Had counsel objected, she might have drawn even more attention to Petitioner's prior inconsistent statements. See Insignares v. Sec'y, Fla. Dep't of Corr., 755 F.3d 1273, 1284 (11th Cir. 2014) ("[T]here are many reasons why defense counsel might not object to [an allegedly improper] statement, including the objection may draw attention to the statement."); Sharpe v. Jones, No. 4:14-cv-550-RH-CAS, 2017 WL 1856284, at *10 (N.D. Fla. Mar. 8, 2017) ("Attorneys sometimes decline to raise valid objections in order to avoid drawing the jury's attention to an objectionable comment . . . ."), adopted by 2017 WL 1855755 (N.D. Fla. May 4, 2017).

Instead of objecting, counsel waited until her closing argument to address the prosecutor's tactics. Specifically, she told the jury that Petitioner "sat up there and . . . played [the prosecutor's] game" with "as much grace and dignity as he possibly could." Doc. 6-2 at 689. Counsel "conceded" that Petitioner was "absolutely guilty of lying" during his first interview with law enforcement. Id. at 692. But Petitioner was "not charged with lying," and (according to counsel) the prosecution's "entire case [was] that [Petitioner] gave two statements, so

36

therefore he must be guilty." Id. at 687, 692. Counsel urged the jury to reject this argument and look beyond Petitioner's inconsistent statements: "We [*i.e.*, the State] can get [Petitioner] on the stand and we can make sure that each and every time he lied [during his first interview], we'll make him demonstrate it, . . . we'll see if we can't just drive him insane. We'll just keep ticking off. You can put a hundred tick marks there, it does not change the fact that the State of Florida has the burden of proof of actually proving what happened." Id. at 692.

On this record, the Court cannot say that "no competent counsel would have taken the action that [Petitioner's] counsel did take." Zakrzewski, 455 F.3d at 1258. Because counsel acted within "the wide range of professionally competent assistance" in addressing the alleged prosecutorial misconduct, the postconviction court reasonably rejected Petitioner's ineffective-assistance claim. Strickland, 466 U.S. at 690; see also Blackmon v. Sec'y, Dep't of Corr., 34 F.4th 1014, 1027-28 (11th Cir. 2022) (state court reasonably found that counsel's "decision not to object [to prosecutorial remarks] did not constitute deficient performance" because "[m]any attorneys take the view. . . that, in the absence of something very egregious, it's simply better not to object and not call attention to the State's closing"); Walker v. Dixon, No. 4:22-cv-4-AW-MJF, 2022 WL 18356374, at *13 (N.D. Fla. Dec. 2, 2022) ("[R]easonable defense attorneys have different strategies for dealing with arguably improper prosecutorial

37

remarks in closing argument."), adopted by 2023 WL 218971 (N.D. Fla. Jan. 17, 2023).

### G. Ground Six—Failure to Request Written Order on Competency to Stand Trial

Lastly, Petitioner faults trial counsel for failing to ensure that the trial court entered a "formal written order" on his competency to stand trial. Doc. 3 at 17. Some additional procedural background is necessary to understand this claim.

Before trial, the court appointed experts to evaluate Petitioner's competency. Doc. 6-1 at 434-36. The court subsequently held a two-day competency hearing, taking testimony from Dr. Stephen Bloomfield, Dr. Alan Waldman, and Dr. Umesh Mhatre. Doc. 9 at 10-153. Dr. Bloomfield opined that, while Petitioner scored "low" on a memory test, he also received "scores that would typically be considered malingering" on a "malingering test." Id. at 24. Dr. Bloomfield "didn't feel comfortable saying" that Petitioner "had a significant memory problem" or "was malingering." Id. at 24-25. Thus, Dr. Bloomfield thought it would be "prudent" to "adjudicate[]" Petitioner incompetent so that he could be admitted to a "hospital" where his "malingering" could be "looked at" and "rule[d] . . . out." Id. at 38.

By contrast, Dr. Waldman opined that Petitioner was "competent to proceed." Id. at 48. According to Dr. Waldman, Petitioner was "malingering."

38

Id. at 58. Dr. Waldman claimed that Petitioner's memory-test results were "absurd": "People who have feeding tubes [or] have half of their brain working normally score in the 40's on this particular test. [Petitioner] scored in the mid 20's and . . . 30 out of 50." Id. at 52. Moreover, Dr. Waldman noted that people with "memory dysfunction normally have . . . a response latency," but Petitioner frequently said he could not "remember" "even before I [got] the full question out." Id. Dr. Waldman also listened to an audio recording of Petitioner interacting with other detainees at the county jail. Id. at 59. Petitioner could be overheard playing chess, "giving [inmates] recipes," "talking about who was playing in a rather obscure bowl game," telling somebody that Kareem Abdul-Jabbar's "real name" was Lew Alcindor, and complaining about the prosecutor in his case. Id. at 59-60.

Finally, Dr. Mhatre opined that Petitioner could "understand the charges" against him and "appreciate the range of possible penalties." Id. at 131-32. In Dr. Mhatre's view, Petitioner was not "psychotic or crazy"; he was "just depressed." Id. at 115. Dr. Mhatre believed that Petitioner would have difficulty assisting in his defense "because of [his] depression." Id. at 116. According to Dr. Mhatre, Petitioner was a "defeated man" who would "have problems challenging the witnesses" and might not be "able to focus and concentrate" on the trial. Id. In sum, Dr. Mhatre concluded that Petitioner's "overall depression" made him "incompetent." Id. at 123.

At the conclusion of the hearing, the court ordered the parties to submit written memoranda on the competency issue. Id. at 151-52. The parties complied. Id. at 5-9, 154-60. Florida law requires a trial court "to delineate its findings regarding the competency of the defendant in a written order," but the record does not include a written order on Petitioner's competency. Mullens v. State, 197 So. 3d 16, 37 (Fla. 2016). One month after the written memoranda were submitted, however, the court held a status conference. Doc. 6-11 at 840. At the conference, defense counsel stated that the parties would need "at least three" days for trial. Id. Counsel then said, "Just for clarification purposes, Your Honor, this is actually up today for ruling on a competency issue. Your Honor issued a written order on that, so [the prosecutor] and I assume that they will be used for trial, so . . ." Id. at 842-43 (ellipsis in original). The court responded, "Okay, the final pretrial will be November 19th, and jury selection will be December 1st." Id. at 843. After discussing the parties' conflicts, the court set the "final pretrial [for] January 7th and jury selection [for] January 12th." Id. at 843-44.

The case went to trial without any further on-the-record discussion of Petitioner's competency. At trial, Petitioner was represented by a new attorney because his former attorney was forced to withdraw for health reasons. Doc. 6-1 at 629-33. Successor counsel later testified that she met with Petitioner's former attorney to discuss the competency issue. Doc. 6-11 at 162-63. The

40

former attorney told her that the court "had ruled [Petitioner] . . . competent" after "thoroughly examin[ing]" the issue. Id. at 163. Successor counsel did not, however, "double-check[] on where th[e] order was." Id.

Petitioner now contends that counsel provided ineffective assistance by failing to ensure that the court "enter[ed] a formal written order outlining its [competency] determination and the basis for that determination." Doc. 3 at 17. Even under *de novo* review, this claim fails for lack of prejudice.

To show prejudice in this context, Petitioner must establish that "if his trial counsel had performed as he [suggests], there is a reasonable probability that the trial judge would have determined that [he] was incompetent to stand trial." Oats v. Singletary, 141 F.3d 1018, 1025 (11th Cir. 1998). The test for determining competency to stand trial is "whether a criminal defendant [1] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and [2] whether he has a rational as well as factual understanding of the proceedings against him." Drope v. Missouri, 420 U.S. 162, 171 (1975).

Petitioner fails to establish a reasonable probability that he "would have been found incompetent" had counsel requested a written order on the issue. Lawrence v. Sec'y, Fla. Dep't of Corr., 700 F.3d 464, 480 (11th Cir. 2012). As noted above, no written order appears in the record, and the state-court docket sheet contains no entry memorializing such an order. Doc. 6. Nevertheless, the

record strongly suggests that the trial court believed Petitioner was competent to stand trial. The court ordered expert evaluations, presided over a lengthy, two-day competency hearing, and received written memoranda on the issue. Doc. 9. At a subsequent status conference, the parties and the court discussed trial dates. Doc. 6-11 at 842. During this discussion, defense counsel stated that the court had already "issued a written order" on the competency issue. Id. at 843. The court did not indicate that competency remained unresolved or that it intended to revisit the issue. Instead, it set the case for trial: "All right, final pretrial January 7th and jury selection January 12th." Id. at 843-44. The case went to trial, and Petitioner was convicted of the crimes listed above.[9]

Against this backdrop, Petitioner fails to show a "reasonable probability that the trial judge would have determined that [he] was incompetent to stand trial" had counsel insisted on a written order. Oats, 141 F.3d at 1025. If the court had not yet concluded Petitioner was competent—or if it believed the issue was unresolved—it likely would not have scheduled the case for trial without noting that a competency determination remained pending. Indeed, the circumstances outlined above indicate that the court understood the competency issue to have been resolved in favor of competency. This conclusion

---

[9] After the status conference, the prosecution filed an opposition to Petitioner's motion to sever, asserting that Petitioner had been "caught" attempting to "hoodwink this [c]ourt by faking symptoms of incompetence." Doc. 6-1 at 674.

42

is reinforced by the testimony of successor counsel, who stated that Petitioner's former attorney assured her that the court "had ruled [Petitioner] . . . competent" after "thoroughly examin[ing]" the issue. Doc. 6-11 at 163. Nothing in the record suggests that the court harbored lingering doubts about competency that would have led it to reach a different conclusion had counsel pointed out the allegedly missing order. Moreover, a finding of competency was amply supported by Dr. Waldman's opinion that Petitioner was "competent to proceed" and was simply "malingering" in an attempt to avoid trial. Doc. 9 at 48, 58. Thus, there is no reasonable probability that Petitioner "would have been found incompetent" had counsel acted as Petitioner proposes. Lawrence, 700 F.3d at 480.

Because Petitioner has not met his "high" burden of "demonstrating prejudice," his ineffective-assistance claim fails. Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002).

Accordingly, it is

**ORDERED**:

1.     The Amended Petition (Doc. 3) is **DENIED**, and this case is **DISMISSED with prejudice**.

2.     If Petitioner appeals, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any

motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[10]

3.    The **Clerk** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 7th day of July, 2026.



TIMOTHY J. CORRIGAN
Senior United States District Judge

TpaP-2
c:
Harold Thomas Hammond, #149729
Counsel of Record

---

[10] The Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.